**UNDER SEAL**

**FILED**
CHARLOTTE, NC

SEP 21 2016

US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> ) <br> v. ) <br> ) <br> ) <br> ) <br> **CARL LEE FERRELL** ) <br> ) <br> ) | DOCKET NO. 3:16CR230-MOC <br><br> **BILL OF INDICTMENT** <br><br> Violations: <br><br> 18 U.S.C. § 1343 <br> 18 U.S.C. § 1512(c)(2) |

**THE GRAND JURY CHARGES:**

At the specified times and at all relevant times:

1.  From in or about 2012 through in or about the present, the defendant CARL LEE FERRELL executed a scheme to defraud victims of over $400,000 by inducing them to invest money in a variety of fraudulent real estate investment deals and other services.

2.  FERRELL is a resident of Waxhaw, North Carolina. FERRELL presented himself as the Managing Member and President and CEO of Wholesale Properties International, LLC ("Wholesale Properties") as well as a Member of Direct Properties Nationwide, LLC.

3.  As part of the scheme to defraud, FERRELL induced victims to part with their money by making numerous false and fraudulent representations, omitting material facts, and telling deceptive half-truths.

4.  For example, FERRELL created or caused to be created a webpage for Wholesale Properties which contained numerous false and fraudulent representations and deceptive half-truths in an effort to induce victims to invest in the company, including:

    a.  That Wholesale Properties was a large international real estate property investment company, with several departments or divisions and locations in North Carolina, South Carolina, and Washington, D.C.;

    b.  That Wholesale Properties was "a national private buyer/seller" that "provide[d] our buyers the opportunity to purchase in order sizes from $5 Million to $1.5 Billion," was involved with Letter of Intent Components in the magnitude of "$USD 20 Million," an exemplar Broker Price Opinion Delivery Range was "$30.7 Million to $40 Million," and Wholesale Properties received a commission of "3% (or 4% for orders under $30 Million);" and

1

c. That the "WPI Program puts you directly in touch with your assigned rep the minute you fill out the questionnaire" and that "[y]ou will receive a response email which will include your assigned client services associate contact number."

5. In truth and fact, these statements were false and/or misleading. For example:

a. Wholesale Properties was operated by FERRELL, with the assistance of his girlfriend and, more recently one another individual, primarily out of his rented home in Waxhaw, North Carolina;

b. FERRELL was, at a minimum, misrepresenting the nature and scope of Wholesale Properties business to fraudulently induce and reassure victims, as it had never consummated a million-dollar deal, much less the capacity a "purchase in order sizes from $5 Million to $1.5 Billion," a deal "in the magnitude of $USD 20 Million" or a Delivery Range of "$30.7 Million to $40 Million;" and

c. Wholesale Properties did not have assigned client services representatives. Instead, FERRELL would often pretend to be a client services representative named "Lee" when dealing with victims.

6. To further induce victims to invest in his scheme, FERRELL utilized false testimonials on his website, with the Better Business Bureau, and in his emails.

7. In general, the scheme worked as follows:

a. In some instances, FERRELL, often pretending to be "Lee" of the "Client Services Division," provided victims with an "Investment Agreement," signed by FERRELL as CEO of Wholesale Properties, in which the victim agreed to invest a particular sum with regard to a particular property identified in the agreement, and Wholesale Properties which would promise repayment of the investment plus a 25% return on the investment within either 90 or 120 days;

b. In other instances, FERRELL, again often pretending to be "Lee," provided a "Consulting Agreement," which the "client may elect WPI to refund" if a suitable property was not found in 90 days;

c. In either instance, the victim wired the funds to the Wholesale Properties account, as directed;

d. The 90 or 120 days passed without the victim receiving, in the first instance, either repayment of the principle investment or any return on investment, and, in the second instance, the consulting services they paid for; and

e. The victims then demanded their money back.

8. When the victims began demanding their money back, FERRELL made various excuses and false and fraudulent representations, omitting material facts, and telling deceptive half-truths, including that:

    a. The check was in the mail;

    b. Wholesale Properties had been sold to another company and the new company's accounting department would have to send the money; and

    c. The accounting department only sends checks out in big batches.

9. In truth and fact, FERRELL rarely used the victim money as promised. Instead, FERRELL often used victim money to pay for, for example:

    a. Personal expenses, such as rent on his house, clothing, food, and entertainment;

    b. Payments related to properties other than those set forth in the agreements with the victims; and

    c. To pay other victims, in Ponzi fashion.

10. As a result, when victims began demanding their money back, FERRELL either did not have the money to repay the victims, as agreed to, or used monies from new victims to make lulling or Ponzi payments to the victims.

11. Eventually, when they had not received their money as promised, certain victims filed civil lawsuits against FERRELL for the return of their investment. In an effort to further conceal his fraud, in one of those lawsuits FERRELL lied under oath in a deposition taken on October 9, 2014 in Mecklenburg County. For example,

    a. FERRELL was questioned about Wholesale Properties bank accounts:

        Q. Does WPI have a bank account?

        A. Checking account, yes, we do.

        Q. Which bank is that with?

        A. That's with SunTrust.

        Q. Are there any other bank accounts?

        A. Nope.

    b. In truth and fact, Wholesale Properties did have other bank accounts during the relevant time period, and, in particular, had two accounts in the name of Wholesale Properties with Bank of America.

c. In a second example, FERRELL also falsely testified about what was owed to other victims:

> Q. Who else does WPI owe money to other than these lenders we've talked about and my client [R.H. and J.E.]?
>
> A. That's it.
>
> Q. There's no other debt?
>
> A. No other debt.

d. In truth and fact, at the time FERRELL still owed several victims their money.

e. In another example, FERRELL was questioned at length about the existence of "Lee" and whether or not he was actually "Lee," and, in response, he made a number of false and/or misleading statements, omissions, and deceptive half-truths, ultimately denying having ever gone by the name "Lee" or that he had ever talked with victim R.H.

f. In truth and fact, as he later admitted when interviewed by the Federal Bureau of Investigation, the "Lee" that communicated with victim R.H. was, in fact, FERRELL.

12. After a Grand Jury in the Western District of North Carolina began investigating FERRELL and Wholesale Properties, on March 13, 2015, FERRELL made several false and misleading statements in an interview with the Federal Bureau of Investigation in an effort to further conceal his fraud, including:

a. That he opened the bank accounts for Wholesale Properties himself and no one else was on those accounts with him, when, in truth and fact, his girlfriend was listed on the bank accounts as "VP" or "Vice President;"

b. That his girlfriend never signed anything related to his businesses, when, in truth and fact, his girlfriend has signed documents related to the business, including signing checks drawn on the Wholesale Properties account for, among other things, a Ponzi payment; and

c. Misleading statements regarding his income.

13. Notwithstanding the civil lawsuits and knowing he was under investigation by the FBI, FERRELL continued to fraudulently solicit investor victims, take their money, and then make false and misleading statements when those investor victims demanded their money back.

4

## COUNT ONE

### 18 U.S.C. § 1343
### (Wire Fraud Scheme to Defraud Investors)

14. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 13 of the Bill of Indictment, and further alleges that:

15. From in or about 2012 through in or about the present, in Mecklenburg and Union Counties, within the Western District of North Carolina and elsewhere, the defendant,

### CARL LEE FERRELL

with the intent to defraud, did knowingly and intentionally devise the above described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did cause to be transmitted by means of wire communication in interstate commerce any writing, signal, or sound, to wit, the defendant, while located Mecklenburg and Union Counties, North Carolina, did send or cause to be sent emails, telephone calls, and wire transfers to and from banks, and investor victims and their intermediaries in other States.

All in violation of Title 18, United States Code, Sections 1343.

## COUNT TWO

### 18 U.S.C. § 1512(c)(2)
### (Obstruction of Official Proceeding)

16. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 13 of the Bill of Indictment, and further alleges that:

17. In or about 2015, within the Western District of North Carolina, and elsewhere, the defendant,

### CARL LEE FERRELL

through the course of conduct alleged above, did corruptly obstruct, influence, and impede, and attempt to obstruct, influence and impede, an official proceeding, to wit, the proceeding of the Federal Grand Jury sitting in the Western District of North Carolina.

All in violation of Title 18, United States Code, Section 1512(c)(2).

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

18. Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

    a. All property which constitutes or is derived from proceeds of the violations set forth in this bill of indictment; and

    b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

    c. The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above: a forfeiture money judgment in the amount of at least $400,000, such amount constituting the proceeds of the violations set forth in this bill of indictment.

A TRUE BILL

███████████████████
FOREPERSON

JILL WESTMORELAND ROSE
UNITED STATES ATTORNEY

*/s/ Maria K. Vento*
MARIA K. VENTO
ASSISTANT UNITED STATES ATTORNEY

7
Case 3:16-cr-00230-MOC-DSC   Document 3   Filed 09/21/16   Page 7 of 7